NOT FOR PUBLICATION                              [Dkt. Ent. 37]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

DAMIAN MELTON,

     Plaintiff,

        v.

RESORTS INTERNATIONAL HOTEL,
INC., et al.,

     Defendants.

Civil Action No. 11-06449
(RMB/KMW)

**OPINION**

Appearances

Manali Ahah Arora
Justin L. Swidler
Richard Steven Swartz
Swartz Swindler LLC
1878 Marlton Pike East
Society Hill Office Park
Cherry Hill, NJ  08003
    Attorneys for Plaintiff Damian Melton

Alyson M. Tomljenovic
Russell L. Lichtenstein
Cooper Levenson
1125 Atlantic Avenue
Atlantic City, NJ  08401
    Attorneys for Defendants DGMB Casino, LLC, Gomes Gaming,
    Inc., and Dennis Gomes

BUMB, United States District Judge:

This matter comes before the Court upon a motion for

summary judgment filed by Defendants DGMB Casino, LLC d/b/a

Resorts ("DGMB"), Gomes Gaming, Inc. d/b/a Resorts Casino Hotel

("Gomes Gaming"), and Dennis Gomes ("Gomes") (collectively,

1

"Defendants"). For the reasons set forth below, summary judgment is denied.

## I.   BACKGROUND

Plaintiff, who has been diagnosed with Type I diabetes, was hired as a door person at Resorts Atlantic City ("Resorts AC") in May 2004. (Defs.' Statement of Undisputed Material Facts ("DSUMF") ¶ 1; Pl.'s Resp. to DSUMF ("PRDSUMF") ¶ 1; Pl.'s Statement of Material Facts ("PSMF") ¶ 1; Defs.' Reply Statement of Undisputed Material Facts ("DRSUMF") ¶ 1.) He worked at Resorts AC until his termination in December 2010. (PSMF ¶ 45; DRSUMF ¶ 45.) While Plaintiff was employed as a door person at Resorts AC, he requested and was granted intermittent leave under the FMLA for his diabetes each year that he was eligible. (DSUMF ¶ 30; PRDSUMF ¶ 30; Declaration of Manali Arora ("Arora Decl."), Exs. K & O.) In addition, Plaintiff contends that he was granted an accommodation such that he did not need to work the graveyard shift. (See Ex. F ("McCarthy Dep.") 23:6-9.) Defendants dispute that Plaintiff either requested or was granted a specific accommodation with respect to the graveyard shift. Regardless, Plaintiff was never denied FMLA leave. (DSUMF ¶ 31; PRDSUMF ¶ 31.)

Paul McCarthy, who supervised parking and door persons, was aware of Plaintiff's medical condition and the associated accommodations, including an accommodation excusing Plaintiff

from working the graveyard shift. (See McCarthy Dep. 13:23-14:5 (testifying he received a list of employees who had been approved for FMLA leave).) McCarthy testified that he spoke with his supervisors, including Marie Campbell, about Plaintiff's accommodation because he "wanted to make sure that they were aware of that accommodation because it wasn't in his [Plaintiff's] file . . . ." (Id. at 24:10-22, 26:7-27:3.)

In August 2010, Plaintiff sustained a shoulder injury that required surgery and physical therapy. (PSMF ¶ 44; DRSUMF ¶ 44.) Upon his return from medical leave in late September/early October 2010, he was assigned to light duty as a valet cashier. (Id.) He remained in this position until his termination in December 2010. (PSMF ¶ 45; DRSUMF ¶ 45.)

Plaintiff's employer, Resorts AC, was owned and operated by Defendant Resorts International Hotel, Inc. ("RIHI") until approximately November 2008 when it defaulted on a credit facility. (DSUMF ¶¶ 1-2.) RIHI subsequently entered into a Deed-in-Lieu of Foreclosure around December 16, 2009, pursuant to which Resorts AC was transferred to RAC Atlantic City Holdings, LLC ("RAC"). (DSUMF ¶ 2 (citing Ex. C).) As a result, RAC became the owner of the real estate, and either owned or obtained the right to assign all rights, title, and interest in the business assets. (Id. ¶ 3.) However, the casino license issued to RAC did not permit it to operate the facility. (Id. ¶ 4.) Accordingly,

3

RAC and RIHI entered into a management agreement whereby RIHI continued to function as Resorts AC's operator. In this capacity, RIHI was responsible for employment at Resorts AC. (Id. ¶ 5.)

On August 17, 2010, Defendant DGMB, through Defendant Gomes Gaming, entered into an Asset Purchase Agreement ("APA") with RAC according to which DGMB acquired certain real and personal property. (Id. ¶¶ 6-9.) In September 2010, Plaintiff and other RIHI employees received a Warn Notice, advising them that DGMB would be "acquiring the assets of Resorts" and would "consider itself to be a new employer for all individual[s] who [DGMB] chooses to hire." (Id. ¶¶ 10-11 & Ex. D; PRDSUMF ¶¶ 10-11.) RIHI further notified its employees that DGMB would hire the best qualified applicants but, all things being equal, might give preference to former employees over outside sources. (DSUMF ¶¶ 12-13; PRDSUMF ¶¶ 12-13.) Plaintiff and the other employees received an additional notice advising them that RIHI's operations would be terminated as of December 1, 2010, as would their employment. (DSUMF ¶¶ 15-17 & Ex. E.) All employees were terminated and were required to apply for positions with DGMB. (See DSUMF ¶¶ 18-19; PRDSUMF ¶¶ 18-19.) Plaintiff applied for a position as a door person, bartender, valet cashier, and bellman. (PSMF ¶ 51; DRSUMF ¶ 51.) Plaintiff was not hired for any of these positions.

4

Once management positions were filled, the managers were responsible for interviewing and hiring for other positions within their department. (PSMF ¶ 55; DRSUMF ¶ 55.) According to Defendants, DGMB managers who had previously worked for RIHI were not permitted to interview RIHI employees whom they had directly supervised in the past. (DSUMF ¶ 24.) In this way, the process was intended to remain neutral. However, McCarthy, who previously supervised parking and door persons, interviewed several people, including door persons, whom he supervised either at the time of the interview or previously.[1] (See PRDSUMF ¶¶ 24, 26; McCarthy Dep. 8:2-19; Arora Decl., Ex. D ("Gaskins Dep.") 11:20-21 (Chonte Gaskins, door person, was interviewed by McCarthy).) McCarthy testified, however, that he was advised by Campbell not to interview any more door persons because he was no longer going to be the manager of the parking division. (PSMF ¶ 60; DRSUMF ¶ 60.) Defendants dispute that either McCarthy or Campbell had any involvement in the hiring decision for Plaintiff or other door persons. (DRSUMF ¶ 82; DSUMF ¶ 48; DRSUMF ¶ 82.) Under DGMB management, the door persons were placed under the supervision of Dayle Fabrizio, the new front desk manager. (PSMF ¶¶ 63-64; DRSUMF ¶¶ 63-64.) While Fabrizio

---

[1] Specifically, door persons Chonte Gaskins, George Galowina, and Thomas Rzemyk assert that they were interviewed by McCarthy. (PSMF ¶ 70; see also Arora Decl., Exs. G, D, F.)

contends that she did not participate in the decision to hire any of the door persons (Arora Decl., Ex. J ¶¶ 13-14), she does appear to have interviewed at least one. (PSMF ¶ 71.)

Plaintiff asserts that he was interviewed by Kyle Harris,[2] a front desk shift manager, who advised him that "information was going to get passed to Marie Campbell." (Arora Decl., Ex. A ("Melton Dep.") at 131:19-133:5.) Plaintiff testified that he was later informed by McCarthy and Fabrizio that he did not receive the position. (Melton Dep. 135:21-137:5.) Ultimately, DGMB hired six door persons, five of whom had been working for Resorts AC as door persons at that time and one of whom was an outsider, John Teal. (DSUMF ¶¶ 60-64.)

Plaintiff filed the instant action, asserting claims under state and federal law. The Amended Complaint asserts causes of action for interference with FMLA rights (Count I); retaliation for the exercise of FMLA rights (Count II); disability discrimination under the New Jersey Law Against Discrimination (the "NJLAD") (Count III); failure to accommodate under the NJLAD (Count IV); retaliation for protected activity under the NJLAD (Count V); and failure to hire under the NJLAD (Count VI). Defendants moved for summary judgment as to all counts and, on May 21, 2014, this Court held oral argument on Defendants'

---

[2] This individual is also referred to as Kyle Richards. (See DSUMF ¶¶ 39-42.)

motion. The Court subsequently entered an Order granting summary judgment in favor of Defendants as to Counts II, III, IV, and V, denying summary judgment as to Count I, and reserving decision as to Count VI. (Dkt. Ent. 47.) In addition, the Court ordered the parties to file supplemental briefs addressing Count VI and, specifically, the issue of whether or not Plaintiff was qualified for the position to which he applied. This issue is now fully briefed.

**II.   STANDARD**

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." Id.  When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983). However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. Anderson, 477 U.S. at 252. Further, a court does not have to

adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them.  Scott v. Harris, 550 U.S. 373, 380 (2007). In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party . . . ." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). The non-movant's burden is rigorous: it "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatte v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995); Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing

8

Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228
(3d Cir. 2009)) ("[S]peculation and conjecture may not defeat
summary judgment.").

**III.   ANALYSIS**

In Count VI of the Amended Complaint, Plaintiff alleges
that Defendants failed to hire him for the door person position
because of his diabetes in violation of the NJLAD. To assert a
prima facie case for failure to hire under the NJLAD, a
plaintiff must show that he "(1) belongs to a protected class,
(2) applied and was qualified for a position for which the
employer was seeking applicants, (3) was rejected despite
adequate qualifications, and (4) after rejection the position
remained open and the employer continued to seek applications
for persons of plaintiff's qualifications." EEOC v. United
Galaxy, Inc., 2013 U.S. Dist. LEXIS 89200, at *26-27 (D.N.J.
June 25, 2013) (quoting Clowes v. Terminix Int'l, Inc., 538 A.2d
794 (N.J. 1988)). In the employment discrimination context,
NJLAD claims are analyzed under the three-step, burden-shifting
framework established in McDonnell Douglas Corp. v. Green, 411
U.S. 792 (1973), and refined in Texas Department of Community
Affairs v. Burdine, 450 U.S. 248 (1981). Zive v. Stanley
Roberts, Inc., 867 A.2d 1133, 1140 (N.J. 2005). Once a plaintiff
has established his prima facie case, the burden of production
shifts to the employer to articulate a legitimate,

nondiscriminatory reason for the employer's action. Id. The burden then shifts back to the employee to prove that the articulated reason was merely a pretext for discrimination, and that the employer was motivated by a discriminatory intent. Id. "The ultimate burden of persuasion that the employer intentionally discriminated against the employee remains with the employee at all times." Jansen v. Food Circus Supermarkets, Inc., 541 A.2d 682, 691 (N.J. 1988) (citations omitted).

Defendants contend that Plaintiff cannot establish a prima facie case of disability discrimination because he cannot demonstrate that he is otherwise "qualified" for the door person position. Specifically, Defendants argue that Plaintiff was not qualified because he did not possess the physical abilities, attitude, or schedule flexibility necessary for the door person position.[3]

---

[3] Confusingly, Plaintiff also argues that if Defendants had concerns about Plaintiff's need for an accommodation related to the graveyard shift, then summary judgment should be denied because Defendants failed to engage in the interactive process. (Pl.'s Supp. Br. at 1, 10.) However, Plaintiff was undisputedly never employed by Defendants, see Church v. Sears Holding Corp., 2014 WL 2115020, at *12 (D.N.J. May 21, 2014) ("New Jersey courts have recognized an interactive process of arriving at a reasonable accommodation for a disabled employee."). Plaintiff has pointed to no cases in which a court has held that a prospective employer is obligated to engage in the interactive process.

### a. Objectively Qualified

Under the second prong of his prima facie case, Plaintiff must show that he was objectively qualified to perform the job of door person, meaning that he met Defendants' legitimate expectations. Sunkett v. Nat'l Gypsum Co., No. 09-0721, 2011 WL 6719776, at *8 (D.N.J. Dec. 21, 2011) (citing Jansen, 541 A.2d at 691-92). As other courts in this District have recognized, this issue often turns on what are the "essential functions of the job." See, e.g., Leshner v. McCollister's Transportation Sys., Inc., 113 F. Supp. 2d 689, 692 (D.N.J. 2000). Under the ADA, on which New Jersey courts rely to interpret similar claims under the NJLAD,[4] id., determinations as to what constitutes an essential function are made on a case-by-case basis with consideration given to "the employer's judgment as to what functions of a job are essential" and to any written job description. Accord 42 U.S.C. § 12111(8); Smith v. Burlington Cnty. of New Jersey, No. 02-5581, 2004 WL 1932850, at *3 (D.N.J. July 27, 2004). Essential functions of a position do not include

---

[4] "The standard for analyzing an NJLAD claim in the summary judgment context is the same as that applicable to claims of discrimination under federal statutes." Maher v. Abbott Labs., No. 11-5161, 2013 WL 6326488, at *9 n.7 (D.N.J. Dec. 4, 2013) (citation omitted); see also Jones v. Aluminum Shapes, Inc., 772 A.2d 34, 40 (N.J. Super. App. Div. 2001).

marginal functions. In addition, the ADA regulations provide a non-exhaustive list of factors to consider, including:

> (i) The employer's judgment as to which functions are essential; (ii) written job descriptions prepared before advertising or interviewing applicants for the job; (iii) [t]he amount of time spent on the job performing the function; (iv) [t]he consequences of not requiring the incumbent to perform the function; (v) [t]he terms of a collective bargaining agreement; (vi) [t]he work experience of past incumbents in the job; and/or (vii) [t]he current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3). The Court finds that Plaintiff has adduced sufficient evidence to survive summary judgment.

The inquiry into what constitutes the essential functions of the door person position is complicated by the fact that neither party submitted an applicable job description. For his part, Plaintiff submitted a job description dated June 1, 2009, prior to the takeover by DGMB (see Supplemental Declaration of Manali Arora ("Arora Supp. Decl."), Ex. A), and a job description for door captains, apparently advertised by Gomes (Ex. B). It is undisputed, however, that a door person is required to lift and carry luggage, and to greet guests. (See, e.g., Defs.' Supp. Br. at 5 n.1; Arora Supp. Decl. Exs. A, B; PSMF ¶ 9; DRSUMF ¶ 9.)

Plaintiff argues that he has met his burden of demonstrating that he could perform the essential functions of the door person position because he had been employed as a door

person at the casino since 2004.[5] According to Plaintiff, citing this Court's decision in Sunkett v. Nat'l Gypsum Co., "proof by a plaintiff that he performed the actual job is sufficient to meet such burden." (Pl.'s Supp. Sur-reply at 3.) However, Plaintiff overstates his case. In Zive v. Stanley Roberts, Inc., 867 A.2d 1133, 1143–44 (N.J. 2005), the New Jersey Supreme Court held that to satisfy the second prong, the plaintiff must "produce evidence showing that [he] was actually performing the job prior to the termination." Here, Plaintiff was not working as a door person at the time of the challenged hiring decision. Rather, in November and December 2010, he had been assigned to light duty as a valet cashier because his prior shoulder injury prevented him from performing his door person responsibilities.[6] (Melton Dep. 103:5-16 ("I returned to light duty, because I couldn't be a doorman. So, they generally assigned me as a cashier, but I didn't have a bank.").) Defendants argue that because of this reassignment to light duty and Plaintiff's

---

[5] Plaintiff misstates this Court's decision in Sunkett. Contrary to Plaintiff's assertion, this Court did not find that the plaintiff's prior performance as a forklift operator was sufficient to show he was qualified but instead "assume[d], without deciding, that Plaintiff has shown that he could perform the job . . . ." 2011 WL 6719776, at *9.

[6] Plaintiff acknowledged that he was not trained as a cashier and therefore was not permitted to have a bank. As such, he "didn't do anything" but "just sat there." (Melton Dep. 103:11-104:22.)

failure to seek his prior position at any time, "one would have
to assume that he was physically incapable of performing the
lifting and other physical activities necessary to act as a
doorperson." (Defs.' Supp. Reply at 6.) However, Plaintiff had
worked as a door person for RIHI for nearly six years, during
which time he had received positive customer and employer
reviews. (PSMF ¶¶ 12-13; DRSUMF ¶¶ 12-13.) Moreover, there is
nothing in the record to suggest that Plaintiff's reassignment
was anything other than a temporary accommodation to permit
Plaintiff's shoulder injury to heal. In the employment
application that Plaintiff completed in November 2010, Plaintiff
recorded his current position as a door person, thereby
indicating to Defendants that the reassignment was merely a
temporary accommodation. (Arora Decl., Ex. Q.) Accordingly, the
Court finds that Plaintiff has met his low burden of
demonstrating an ability to meet the physical demands of the
position, despite the temporary accommodation for his shoulder
injury. See Sunkett, 2011 WL 6719776, at *8 ("[T]he Court
acknowledges that the second prong presents a low hurdle."
(quoting Zive, 436 A.2d at 447)).

Defendants also argue that Plaintiff has failed to meet his
burden on the second prong because he does not have the
appropriate positive and outgoing attitude required for a door
person. The record contains evidence, however, demonstrating

14

that Plaintiff received exceptional reviews from customers, as well as positive feedback from management. (See Arora Decl., Exs. L & M.) This evidence is sufficient to meet Plaintiff's burden at this stage.

Finally, Defendants argue that Plaintiff cannot demonstrate that he was qualified for the door person position because he was unable to work the graveyard shift and therefore did not have the requisite schedule flexibility. In response, Plaintiff argues that Defendants have failed to demonstrate that schedule flexibility is an essential function of the door person position.

As noted above, the absence of an applicable job description complicates the Court's analysis. See 29 C.F.R. § 1630.2(n)(3). Turning to the ADA factors set forth above, Campbell testified that "an employee who couldn't work the grave shift or wouldn't work the grave shift couldn't be considered. . . . Because it's a small department and you have to have people that are flexible with their schedules." (Campbell Dep. 78:20-79:9.) The door person department under DGMB management consisted of only six employees, who were expected to cover shifts 24 hours a day, 7 days a week. (McCarthy Dep. 10:9-11:1.) During high volume times, additional personnel may be needed to ensure adequate coverage. (See, e.g., id. at 20:11-16.) McCarthy also testified that at times, he would need to keep a door

15

person on after the end of their shift in order to ensure
adequate coverage. (Id.) According to Defendants, the ability to
cover all shifts with such a small team was extremely difficult
and thus schedule flexibility was a key factor. Indeed, Campbell
and McCarthy testified regarding dissension among the employees
and coverage difficulties caused by Plaintiff's inability to
work the graveyard shift. (McCarthy Dep. 24:23-26:23 (noting
that employees "felt violated and cheated" when forced to work
the graveyard shift because they had greater seniority than
Plaintiff); Campbell Dep. 29:2-20.) The ADA regulations
recognize that a "function may be essential because of the
limited number of employees available among whom the performance
of that job function can be distributed." 29 C.F.R.
§ 1630.2(n)(2)(ii).

Plaintiff, on the other hand, proffered evidence that the
individuals currently employed as door persons generally work a
regularly-scheduled shift.[7] (Pl.'s St. of Add'l Mat. Facts
("PSAMF") ¶ 3.) See 29 C.F.R. § 1630.2(n)(3)(vii) (factors
include current incumbents' experiences). For example, Figueroa
works several shifts a week, but these are the shifts he has
always worked. (Arora Decl., Ex. E 7:4-8.) In addition, Chonte

---

[7] Plaintiff filed a Statement of Additional Material Facts
with his supplemental submission, but Defendants failed to
respond to it.

Gaskins testified that while she usually works 8:00 a.m. to 4:00 p.m., she has worked every shift. (Gaskins Dep. 7:7-12.) As such, the Court finds that Plaintiff has submitted sufficient evidence to create a genuine issue of material fact as to whether schedule flexibility is an essential function and, thus, whether Plaintiff is qualified for the position of door person. See Fulton v. Johnson & Johnson Pharm. Research & Dev., 2008 WL 544668, at *14 (D.N.J. Feb. 26, 2008) (finding a genuine issue of material fact as to the essential functions of the position and denying summary judgment on ADA claim).

In sum, while there appear to be disputed facts concerning the essential functions of the door person position, as well as Plaintiff's qualifications, Plaintiff has adduced sufficient evidence in support of his prima facie case to survive summary judgment.

### b. Legitimate, Nondiscriminatory Reason & Pretext

Finding that Plaintiff has met the low evidentiary burden of prong two, the Court turns to the remainder of the McDonnell Douglas analysis. Defendants argue that they did not hire Plaintiff for the same reason that they argue he was unqualified for the position – his poor work performance and negative attitude. McCarthy testified that he was told, in making hiring determinations, the primary considerations should be whether the applicant possessed an "upbeat, positive attitude" and that he

17

considered whether the individual was "guest-friendly" and "cheerful". (McCarthy Dep. 37:19-39:24.) McCarthy described Plaintiff's performance as a door person as "barely average": "[h]e was pretty good with guest interactions, but he was not aggressive and quick with the cars coming in. He sometimes became distracted, as in daydreaming, staring off into space with cars waiting, and then he would run over. We sometimes would have to call him." (McCarthy Dep. 19:2-11.) David Figueroa, who worked with Plaintiff as a door person, testified during his deposition that Plaintiff was "lazy," but he also stated that he never conveyed this opinion to anyone in management. (Arora Decl., Ex. E at 9:3-14.) Campbell similarly testified that Plaintiff simply did not meet the attitude requirements of the position. (Arora Decl., Ex. G ("Campbell Dep.") 84:7-10 ("So [Plaintiff] is a very laid back person and he didn't portray, you know, the onstage, you know, outgoing type of personality.").)

In order to satisfy his burden to show pretext, Plaintiff must present sufficient evidence so that a factfinder could reasonably either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. Here, Plaintiff points to evidence that he received

numerous positive employment and customer reviews. (PSMF ¶¶ 12-13; DRSUMF ¶¶ 12-13.) As such, Plaintiff has presented sufficient evidence that a jury could reasonably disbelieve Defendants' nondiscriminatory reasons.

### c. Causation

Defendants also seemingly argue that cannot demonstrate causation because Plaintiff cannot establish that any decision-makers at DGMB knew of his alleged disability or corresponding need to take leave. (Defs.' Mot. at 14.) Although Defendants have been unable to squarely identify which individuals were involved in the decision not to hire Plaintiff, the record contains enough evidence to suggest that those who were involved in some aspect knew of Plaintiff's disability. For example, McCarthy testified that he was aware of Plaintiff's diabetes and that he informed his supervisors of Plaintiff's condition and corresponding inability to work the graveyard shift. (McCarthy Dep. 24:10-22.) He specifically recalled discussing Plaintiff's accommodation with Campbell because of the dissension it caused among the other employees.[8] For her part, Campbell testified that

---

[8] (Id. at 26:7-27:3 ("Q. And during that conversation, did you tell [Campbell] that the reason you weren't scheduling Damian was because he had been approved for an accommodation? A. I did – it did come up in that conversation . . . I'm sure she must have known that Damian because – if she didn't know, I said to her, well, I can't move him because of whatever . . . . Q. But during that conversation, it was clear to you that Marie

she likely had conversations with McCarthy and/or Fabrizio about which door persons would be hired, though she could not recall what was said or when. (Campbell Dep. 62:1-12.) Campbell also vaguely recalled a conversation with an individual, whom she identified as McCarthy, about Plaintiff's inability to be hired because he could not work the graveyard shift. (See id. at 78:10-79:12.) Thus, while Defendants argue that neither Campbell nor McCarthy participated in the decision-making process, the record contains sufficient evidence from which a jury could infer their involvement. Moreover, because the record also suggests that these individuals knew of Plaintiff's condition, a jury could reasonably infer causation.

Thus, the Court finds that Plaintiff has proffered sufficient evidence to defeat summary judgment. See Goldberg v. Egg Harbor Twp. Sch. Dist., 2013 WL 1314425, at *4 (D.N.J. Mar. 28, 2013) ("[C]ourts have consistently recognized that the evidentiary burden at the prima facie stage is 'rather modest,' and intended only to demonstrate that the 'plaintiff's factual scenario is compatible with discriminatory intent-i.e., that discrimination could be a reason for the employer's action.'" (quoting Zive, 867 A.2d at 1139)).

---

Campbell knew that Damian Melton was granted the accommodation? A. At the time I thought she knew.").)

**IV.   CONCLUSION**

In sum, the Court denies Defendants' motion for summary judgment on Count VI, failure to hire under the NJLAD, on grounds that there are genuine issues of material fact regarding the essential functions of the door person position and thus whether Plaintiff was "qualified" for the position.


Date: <u>October 20, 2014</u>

<u>s/Renée Marie Bumb</u>
RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE
